UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                        :
ERGOWERX INTERNATIONAL, LLC                             :
d/b/a/ SMARTFISH TECHNOLOGIES, LLC,                     :
                                                        :        13 Civ. 5633 (PAE)
                                    Plaintiff,          :
                                                        :        OPINION & ORDER
                     -v-                                :
                                                        :
MAXELL CORPORATION OF AMERICA,                          :
                                                        :
                                    Defendant.          :
                                                        :
------------------------------------------------------------------------ X

PAUL A. ENGELMAYER, District Judge:

　　　This lawsuit involves claims, including breach of contract, brought by a manufacturer of

ergonomic computer keyboards and mice against its distribution agent.  The plaintiff, Ergowerx

International, LLC, doing business as Smartfish Technologies, LLC ("Smartfish"), asserts 13

claims against distribution agent Maxell Corporation of America ("Maxell").  In addition to (1)

breach of contract; these claims are for (2) promissory estoppel; (3) intentional interference with

economic advantage; (4) fraud in the inducement; (5) fraud; (6) conversion; (7) patent

infringement; (8) trademark infringement; (9) violations of the Lanham Act; (10) violations of

N.Y. General Business Law § 360; (11) breach of the implied covenant of good faith and fair

dealing; (12) unjust enrichment; and (13) equitable accounting.  Maxell now moves to dismiss all

claims but the breach of contract claim, casting Smartfish's case as "a contract case that

Smartfish attempts to dress up as something more."  Dkt. 25 ("Def. Br.") at 1.  And, as to the

breach-of-contract claim, Maxell moves to dismiss Smartfish's demand for damages stemming

from the alleged breach of the contract's minimum purchase requirement, to the extent that these

arise out of events outside the distribution agreement's 18-month period of exclusivity.  *Id.*  For

the reasons that follow, Maxell's motions to dismiss are granted.

## I.      Background[1]

### A.      The Contract

Smartfish, a New York corporation, sells a line of "injury avoidance" ergonomic

computer keyboards and mice.  FAC ¶¶ 2, 10.  These products are "designed to eliminate risks of

repetitive stress injury and carpal tunnel syndrome for the user."  *Id.* ¶ 10.  The technologies

underlying these products are patent-protected, and the "Smartfish" name is trademarked.  *Id.*

¶ 15.

In early to mid-2009, Smartfish began meeting with Maxell, a New Jersey corporation, to

explore an exclusive distribution agreement.  *Id.* ¶¶ 3, 18.  On July 8, 2009, Maxell told

Smartfish that it had "worldwide distribution opportunities and current channels of sales

opportunities in the U.S., Latin America and Canadian markets."  *Id.* ¶ 19.  During the last three

months of 2009, Maxell told Smartfish that it had "numerous existing worldwide distribution

relationships and channels," which would allow Maxell to "automatically augment its existing

product lines with retailers by adding Smartfish products."  *Id.* ¶¶ 19–20.  Maxell also stated that

it had met with "its 10 key accounts and confirmed the market for Smartfish products existed."

*Id.* ¶ 21.  Finally, Maxell claimed that it would make "a 'financial commitment' to Smartfish" of

over "$3,000,000 [and to] stand by that financial commitment to the end."  *Id.* ¶ 22.  Based on

these and other assurances, Smartfish concluded that it would "benefit from Maxell's existing

relationships and resources."  *Id.* ¶ 19.

---

[1] The Court assumes all facts pled in the First Amended Complaint, Dkt. 21 ("FAC"), to be true,
drawing all reasonable inferences in the plaintiff's favor.  *See Koch v. Christie's Int'l PLC*, 699
F.3d 141, 145 (2d Cir. 2012).

On December 22, 2009, Smartfish and Maxell entered into a distribution agreement.  *Id.*
¶ 24; *see* Dkt. 1, Ex. A ("Agreement").[2]  The agreement made Maxell, for a period of 18 months,
the exclusive distributor of Smartfish's computer keyboards and mice within the United States,
Mexico, Canada, and Latin America.  FAC ¶ 24; *see* Agreement § 3.10.  Maxell was exclusively
authorized to distribute to brick-and-mortar customers in those markets, mail order and non-
online catalog customers, and 28 specified educational and business-to-business ("B2B")
accounts.  *See* Agreement § 3.10.  But the agreement reserved certain distribution channels for
Smartfish, including e-Tailers,[3] Smartfish.com, Amazon, catalogs of e-Tailers, and the remaining
education and B2B accounts.  *Id.*; FAC ¶ 24.

In return for the exclusive distribution rights granted in § 3.10, Smartfish, in turn, agreed
to convey to Maxell "good and clear title to the Products, free and clear of all liens,
encumbrances, restrictions, and other claims against title or ownership (including, without
limitation, claims of patent, copyright or trademark infringement or violations or
misappropriations of trade secrets or other intellectual property rights)."  Agreement § 7.1(a).
The Agreement provided that the Smartfish products distributed by Maxell would be customized
to Maxell's specifications, and that the packaging and product casings would bear both the
Smartfish and Maxell logos (e.g., "Maxell with ErgoMotion Inside").  *Id.* § 5.  Maxell agreed to
pay "additional costs associated with such packaging and shipping specifications," *id.* § 5.1, as

---

[2] The Agreement contains a clause which states:  "Each party to this Agreement hereby
irrevocably agrees to Jurisdiction and Venue in an appropriate court in New Jersey Superior
Court in Bergen County, NJ."  Agreement § 11.2.  At argument, both sides stated that they had
decided to waive this clause.  Dkt. 41 (Oral Argument Transcript ("Tr.")) at 3, 11.

[3] The term "e-Tailer" is not defined in the Agreement, but the Court understands that it refers,
generally, to a retailer who sells goods via electronic transactions on the Internet.  *e-Tailer
Definition*, oxforddictionary.com,
http://www.oxforddictionaries.com/us/definition/american_english/e-tailer (last visited Apr. 22,
2014).

well as the cost "of any and all artwork, including but not limited to Packaging, Instruction

Booklets, Product Labels, Product Graphics, Packaging Contents, etc. to be used in connection

with the Products," *id.* § 4.1.

In exchange for the exclusive right to distribute Smartfish's products in these markets,

Maxell agreed to "use good faith efforts to purchase" certain quantities of keyboards and mice

"during an eighteen (18) month period beginning on the execution date." *Id.* § 3.4(a).

Specifically, Maxell committed that its "total Product purchases (measured by the aggregate

purchase price)" would not "be less than $1,804,800 during such eighteen (18) month period."

*Id.* The agreement defined good faith, or commercially reasonable, efforts to include Maxell's

"educating its sales force on the Products, actively seeking distribution with its partners, and

actively marketing the Products." *Id.* § 3.11.

Finally, the contract contained both renewal and termination provisions. First, if Maxell

was able to sell a certain volume of Smartfish products—specifically, 50,000 keyboards, 80,000

laser mice, and 175,000 optical mice—it would receive "a second (2nd) year of exclusivity for

each product as outlined in Section 3.10."[4] *Id.* at § 3.8. However, Smartfish reserved "the right

to grant a second (2nd) year of exclusivity even if the thresholds are not achieved." *Id.* Either

party had the right to terminate the contract, "with or without cause, upon ninety (90) days prior

written notice to the other party." *Id.* § 10.1. Moreover, if either party failed to comply with any

obligations under the Agreement, and "such failure [was] not remedied within thirty (30) days

after receipt of written notice of such failure, the non-breaching party" could terminate the

Agreement "immediately upon written notice to such (breaching) party." *Id.* § 10.2.

---

[4] The Agreement states that the "Vendor"—Smartfish—will be granted a second year of exclusivity, but at argument, Smartfish acknowledged that that this was a typographical error. *See* Tr. at 19. Section 3.8 of Agreement only makes sense if *Maxell* was the party granted 18 months of additional exclusivity in exchange for meeting a sales benchmark.

### B.    The Alleged Breach

The FAC alleges that Maxell committed multiple breaches of the Agreement.  It alleges that Maxell:  (1) imposed an extra-contractual condition on its purchase of Smartfish's products—namely, by requiring Smartfish to purchase Maxell brand batteries, FAC ¶ 27; (2) failed to reimburse Smartfish for the costs associated with product re-packaging, in violation of § 4 of the Agreement, FAC ¶ 29; (3) distributed Smartfish's products through "unauthorized distribution channels," such as its own online shop, www.shopmaxell.com, which caused Smartfish to close its own website, www.smartfish.com, FAC ¶¶ 30–31; (4) failed to use commercially reasonable efforts to market Smartfish's products, in violation of § 3.11 of the Agreement, FAC ¶ 32; and (5) failed to satisfy the minimum purchase requirement of $1,804,800 worth of Smartfish products during the 18-month period, in violation of § 3.4(a) of the Agreement, FAC ¶ 34.

Smartfish asserts that these breaches of the Agreement have harmed its ability to "survive as an ongoing concern." *Id.* ¶¶ 40–42.

### C.    Procedural History

On August 12, 2013, Smartfish filed its initial Complaint.  Dkt. 1.  On October 8, 2013, Maxell moved to dismiss.  Dkt. 9.  On October 29, 2013, Smartfish filed the FAC.  Dkt. 21.  On November 19, 2013, Maxell submitted a new motion to dismiss, Dkt. 24, and a supporting memorandum of law, Dkt. 25 ("Def. Br.").  On December 5, 2013, an initial conference was held, in which the Court ordered a period of document-based fact discovery, which ended on April 11, 2014.  Dkt. 45.  On December 20, 2013, Smartfish submitted an opposition to Maxell's motion to dismiss.  Dkt. 36 ("Pl. Br.").  On January 6, 2014, Maxell filed a reply brief.  Dkt. 37 ("Def. Rep. Br.").  On February 5, 2014, the Court heard argument.

**II.**     **Applicable Legal Standards**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 50 U.S. at 558.  Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  A pleading that offers only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation omitted).

**III.    Discussion**[5]

**A.    Count One:  Breach of Contract**

Maxell has not moved to dismiss the FAC's breach-of-contract claim in its entirety.

Instead, it moves to dismiss certain damages that Smartfish claims under that cause of action.

Specifically, in the FAC, Smartfish seeks from Maxell $4,653,028 in damages due to the

alleged failure to make the minimum product purchases required by the Agreement.  FAC ¶ 38.

According to Smartfish, Maxell was obliged to make $1.8 million in purchases every 18 months

until the termination of the Agreement.  *See id.* ¶ 34 (the Agreement "imposed a purchase

obligation on Maxell that required it to . . . purchase Smartfish products with a minimum dollar

value of $1,804,800 every 18 months that the Agreement was in effect"); Pl. Br. at 25 ("[T]he

contract imposed a continuing purchase obligation that was not limited to a single 18 month

period but rather imposed a purchase obligation during each 18 month period the contract was in

effect.").  Because Maxell, in the first 18 months, purchased "$751,561 worth of products

covered by the Agreement," FAC ¶ 36, Smartfish claims damages of "$1,053,028 during the

initial 18-month period that the Agreement was in effect," *id.*  Smartfish also seeks "an

---

[5] The Agreement has a choice of law clause, which states:  "The provisions of this Agreement shall be governed, construed and enforced solely in accordance with the laws of New Jersey without regard to the principles thereof relating to conflicts of law."  *Id.* § 11.1.  "The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses."  *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005).  New York courts will generally "enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction."  *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006).  Maxell is a New Jersey corporation, as was Smartfish at the time the Agreement was negotiated; New Jersey law therefore bears a reasonable relationship to the parties and the transaction.  In its briefs, Maxell accordingly applies New Jersey law.  For its part, Smartfish notes that, in practice, "federal procedural law," "federal substantive law," or "New York [s]tatutory law" must also be used, as to certain claims and issues.  Pl. Br. 4 n.1.  Smartfish does not, however, meaningfully challenge the choice-of-law provision.  The Court therefore applies New Jersey law to the state-law claims alleged in the FAC.

additional outstanding purchase obligation of $3,600,000," covering the two ensuing 18-month periods. *Id.* ¶ 38.  In total, then, the FAC seeks damages for the "unsatisfied purchase obligation [of] $4,653,028." *Id.*

Maxell, by contrast, interprets the Agreement to have imposed on it a minimum purchase obligation covering only a single 18-month period, that beginning on December 22, 2009.  *See* Def. Br. at 21.  Maxwell therefore argues that the damages arising from its purported breach of the minimum-purchase obligation are capped at $1,053,028—the balance outstanding from the first 18-month period.  Maxell moves to dismiss Count One, to the extent that it seeks an additional $3.6 million in damages for this alleged breach.

As to this issue, Maxell is correct.  In general, "[d]ismissal of a breach of contract claim is appropriate where a contract's clear, unambiguous language excludes a plaintiff's claim." *Beth Israel Med. Ctr. v. Verizon Bus. Network Servs., Inc.*, No. 11 Civ. 4509 (RJS), 2013 WL 1385210, *2 (S.D.N.Y. Mar. 18, 2013) (citing *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 F. App'x 48, 49 (2d Cir. 2008)); *see also Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003) ("[J]udgment as a matter of law is appropriate if the contract language is unambiguous.").  A contract is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.*, 335 F.3d at 160 (citations omitted).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004).

Here, the clear, unambiguous language of the Agreement contradicts Smartfish's claim that Maxell was required to purchase $1.8 million in products every 18 months, in perpetuity, until the Agreement was terminated.  The relevant section reads:

Maxell will use good faith efforts to purchase from Vendor the following *during an eighteen (18) month period beginning on the execution date*:

| Product | Min | FOB Price | Total |
|---|---|---|---|
| Smartfish Keyboard Model MAX2418B | 10,000 | $48.60 | $486,000 |
| Smartfish Mouse Model MAX2218B | 40,000 | $17.97 | $718,800 |
| Smartfish Mouse Model MAX2018B | 60,000 | $10.00 | $600,000 |
| **Totals** | **110,000** | | **$1,804,8000** |

Agreement § 3.4(a) (emphasis added).

Smartfish's claim that the purchase obligation should be read to perpetually renew itself turns entirely on its assertion that the indefinite article "an," which comes before "eighteen (18) month period" must be "read as one or more or any or every, and is not to be read in the singular."  Tr. at 22.  In so claiming, Smartfish relies on cases in which courts have held that the word "an" should be read as plural.  *See* Pl. Br. at 22–25.  This principle of construction—that an indefinite article should be read as more than one—certainly applies in some contexts.  But it does not apply here, because the last clause of the operative provision firmly points in the other direction, and towards a single, distinct period.

Specifically, in the Agreement, the term "an" is coupled with a fixed period of time—18 months—which is modified by the clause, "beginning on the execution date."  *See* § 3.4.  The "execution date," in turn, is defined in the Agreement as December 22, 2009.  *See* Agreement at 1.  Therefore, read in full, § 3.4 simply defines the minimum purchases Maxell must make over an 18-month period beginning on December 22, 2009.  Despite the use of "an" to modify that period, there can be only one 18-month period that begins on that fixed date—namely, the period

between December 22, 2009 and approximately June 22, 2011.  Read in the context of these surrounding words, the Agreement's text—and the word "an" within it—is unambiguous.

Smartfish's reading of the Agreement to require Maxell to purchase $1.8 million worth of products over *two additional* 18-month periods is, therefore, not plausible, because, by definition, these two additional periods could not also have begun on December 22, 2009. Furthermore, although the Agreement contains a provision for renewing the minimum purchase obligation for periods after the expiration of the initial 18-month period, Smartfish does not argue that there was ever such a renewal.  And by its terms, the renewal provision would have been triggered only if Maxell had achieved certain sales thresholds set forth in § 3.8.  Because these thresholds were higher than those mandated in § 3.4(a), and because both sides agree that Maxell did not reach the sales figures set out in § 3.4(a), the Agreement could not logically have been renewed under § 3.8.

The FAC's claim for $3.6 million in additional minimum-purchase-obligation damages is therefore dismissed.  The contract claim survives, but the damages attributable to the asserted breach of the contract's minimum-purchase obligation are limited to such damages incurred in connection with the 18-month period, beginning December 22, 2009.

**B.    Four of the FAC's Claims Are Precluded by the Breach of Contract Claim**

Four state-law tort and quasi-contract claims brought in the FAC duplicate the breach of contract claim, and are thus precluded under New Jersey's economic loss doctrine.  That doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract."  *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 676 (D.N.J. 2009) (citing *Bracco Diagnostics Inc. v. Bergen Brunswig Drug Co.*, 226 F.Supp.2d 557, 562 (D.N.J. 2002)).  "In other words, whether a tort claim can be asserted

alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Id.* (citation omitted).  Four such counts in the FAC—Count Two, for promissory estoppel; Count Three, for intentional interference with prospective economic advantage; Count Six, for conversion; and Count Twelve, for unjust enrichment—fail to allege conduct extrinsic to the contract.  These counts are therefore dismissed.

**Count Two** asserts a claim of promissory estoppel.  To state such a claim, Smartfish must establish that "(1) there was a clear and definite promise; (2) the promise was made with the expectation that the promisee would rely upon it; (3) the promisee reasonably did rely on the promise; and (4) incurred a detriment in said reliance." *Martin v. Port Auth. Transit Corp.*, No. 09–3165 (NLH), 2010 WL 1257730, at *5 (D.N.J. Mar. 25, 2010); *see also Ilowite v. Diopsys, Inc.*, No. 04-2368 (HAA), 2008 WL 305267, at *14 (D.N.J. Jan. 31, 2008).

Generally, however, "an equitable claim cannot lie where a contract governs the relationship between the parties that gives rise to the equitable claim." *Ready & Motivated Minds, LLC v. Ceridian Corp.*, No. 10–1654 (JLL), 2010 WL 2989986, at *7 (D.N.J. July 26, 2010); *see also Ctr. for Special Procedures v. Connecticut Gen. Life Ins. Co.*, No. 09-6566 (MLC), 2010 WL 5068164 (D.N.J. Dec. 6, 2010).  Although Smartfish argues that it should be permitted to plead in the alternative under Federal Rule of Civil Procedure 8(d), *see* Pl. Br. 4, here, an express contract governs Smartfish's claims, and Maxell concedes that the Agreement is valid and enforceable, *see* Def. Rep. Br. 1.  Further, Count Two, as pled, is devoid of facts that would distinguish it from the breach of contract claim; it merely alleges that Maxell promised Smartfish that it would make certain investments in the joint venture and purchase a certain number of "products custom produced by Smartfish for Maxell." FAC ¶ 55.  Because Maxell's

failure to meet those promises is encompassed by the FAC's breach of contract claim, the promissory estoppel claim is duplicative.  Accordingly, Count Two is dismissed.

**Count Three** asserts a claim for intentional (or tortious) interference with prospective economic advantage.  To adequately plead such a claim, Smartfish must "set forth facts alleging (1) some protectable right—a prospective economic or contractual relationship, (2) the interference was done intentionally and with malice, (3) the interference caused the loss of the prospective gain, and (4) the injury caused damage."  *Ctr. for Special Procedures*, 2010 WL 5068164, at *7 (citing *Printing Mart–Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751–52 (1989)).  It is "fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship."  *Printing Mart–Morristown*, 116 N.J. at 752.  "Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law."  *Id.* at 753.

Maxell originally claimed that Count Three should be dismissed on the ground that Maxell is a party to the contractual relationship giving rise to the claim, and thus could not have interfered with its own contract.  Def. Br. 10–11.  However, as Maxell acknowledged at argument, that position misapprehended Smartfish's claim in Count Three.  *See* Tr. 6.  Maxell now understands, as does the Court, that Smartfish intended Count Three to allege that Maxell sold products outside of its contractually designated zones of distribution, and that *these* sales interfered with Smartfish's relationships with *other* parties within those markets.  *See* FAC ¶ 64 (alleging that Maxell engaged in "unauthorized sales of products through channels reserved to Smartfish and forbidden to Maxell," and that these actions "cannibalized sales" that Smartfish

expected to keep for itself); *see also* Pl. Br. at 7 ("In the present case, Smartfish has alleged that Defendant interfered with Smartfish's prospective relationships with third parties.").

If Count Three is thus construed, however, Smartfish's claim there is precluded under New Jersey's economic loss doctrine.  The harm alleged in Count Three is fairly encompassed by the breach of contract claim, and therefore duplicates Count One.  At argument, counsel for Maxell acknowledged that Count One, as pled, is broad enough to permit Smartfish to pursue multiple alleged breaches of the Agreement.  These included not only that Maxell failed to purchase $1.8 million worth of products, but also, pivotal here, that it sold products to other parties in "unauthorized distribution channels."  *See* Tr. at 10–11 ("Q:  In other words, to the extent that plaintiffs are trying to be made whole, if they're right on the facts, for your exceeding the bounds that you're authorized by contract, you're not disputing that that area of conduct is properly captured by the currently existing contract claim.  A:  Correct.  We are not disputing that.").  Counsel for Smartfish similarly acknowledged at argument that its breach of contract claim was broad enough to capture the harm alleged in Count Three.  *Id.* at 16 ("Q:  As to that area of conduct, Maxell selling in distribution channels that it was not contractually authorized to sell in, is that captured by your breach of contract claim?  A: I think it is captured by our breach of contract claim.").  Smartfish's counsel later attempted to qualify that acknowledgment, but did not do so persuasively.

Because the harms alleged in Count Three are intrinsic to the Agreement, Smartfish may not recover "in tort economic losses to which their entitlement flows from a contract."  *State Capital*, 646 F. Supp. 2d at 676.  Accordingly, Count Three is dismissed.

**Count Six** asserts a claim of conversion; it makes the bare-bones claim that Maxell converted "Smartfish property such as Smartfish artwork."  FAC ¶ 93.  Under New Jersey law,

conversion "is the wrongful exercise of dominion and control over property owned by another in a manner inconsistent with the owner's rights." *StrikeForce Technologies, Inc. v. WhiteSky, Inc.*, No. 13-1895 (SRC), 2013 WL 3508835, *8 (D.N.J. July 11, 2013) (citing *Advanced Enters. Recycling, Inc. v. Bercaw*, 376 N.J. Super. 153, 161 (App. Div. 2005)).  This claim is dismissed for two reasons.

First, to the extent that the FAC alleges conversion of artwork covered by the Agreement, that claim would be precluded under the economic loss doctrine.  The FAC does not specify the nature of the artwork allegedly converted, but it appears, from the FAC, to refer to promotional artwork related to Smartfish's products.  However, conversion of such artwork would constitute an independent breach of the Agreement.  *See* Agreement § 4.1 (Maxell is responsible for paying the cost "of any and all artwork, including but not limited to Packaging, Instruction Booklets, Product Labels, Product Graphics, Packaging Contents, etc. to be used in connection with the Products").  As such, Count Six seeks recovery through a claim of conversion, where Smartfish's "alleged entitlement to the monies flowed from a contract." *Titan Stone, Tile & Masonry, Inc. v. Hunt Const. Grp., Inc.*, No. 05-3362 (GEB), 2007 WL 174710 (D.N.J. Jan. 22, 2007).  The economic loss doctrine precludes such a claim.

Second, if the FAC instead meant to allege the conversion of other, unnamed artwork, as Smartfish contended in its brief opposing dismissal, it must be dismissed for failure to state a claim upon which relief may be granted.  *See* Pl. Br. 6  (asserting that the "conversion claim arises from Smartfish artwork not covered by the contract that was converted by Defendant," and that this "artwork was separate from the artwork and other materials to be used in connection with the products that Maxell commissioned but failed to pay for that is part of Plaintiff's breach of contract claim").  The FAC does not specify the artwork that Smartfish claims was converted

14

by Maxwell, but makes the claim only generically (and even if Smartfish's "clarification" in its brief could add the necessary clarity, it does not do so).  This deficiency requires dismissal of the conversion claim.  *See Iqbal*, 556 U.S. at 678 (a claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); *accord Calcutti v. SBU, Inc.*, 224 F. Supp. 2d 691, 702-03 (S.D.N.Y. 2002) (because plaintiff's conversion claim "is devoid of facts that would put [defendant] on notice, the Court must dismiss it").

Accordingly, for both reasons, Count Six is dismissed.

Finally, **Count Twelve** asserts a quasi-contractual claim of unjust enrichment.  This claim, too, is based on allegations that are fairly encompassed within the FAC's breach of contract claim.  "Both federal and state courts in New Jersey routinely hold that, under New Jersey law, a party cannot seek to recover on a quasi-contract theory, *e.g.,* for unjust enrichment, when an actual contract exists governing the relationship between the parties." *Schweikert v. Baxter Healthcare Corp.*, No. 12-5876 (FLW), 2013 WL 1966114, *6 (D.N.J. May 10, 2013); *see also Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 310 (3d Cir. 1982) (under New Jersey law, "recovery under unjust enrichment may not be had when a valid, unrescinded contract governs the rights of the parties"); *Moser v. Milner Hotels, Inc.*, 6 N.J. 278, 280–81 (1951) ("An implied contract cannot exist when there is an existing express contract about the identical subject.").  In short, "recovery based on a quasi-contract theory is mutually exclusive of a recovery based on contract theory." *Duffy v. Charles Schwab & Co., Inc.*, 123 F. Supp. 2d 802, 814 (D.N.J. 2000).

Smartfish responds by asserting that it should be permitted to plead in the alternative. *See* Pl. Br. 4–6 (citing Fed. R. Civ. Pro. 8(d)).  But the cases on which Smartfish relies all involved defendants who challenged the validity of the underlying contract.  Here, by contrast,

Maxell concedes that the Agreement is valid and enforceable.  *See* Def. Rep. Br. 1.  Accordingly, the motion to dismiss Count Twelve is granted.

### C.      The FAC's Fraud-Based Claims

Counts Four and Five assert claims of fraud in the inducement and common-law fraud. In New Jersey, the elements of both claims are identical.  *See TekDoc Servs., LLC v. 3i-Infotech Inc.*, No. 09-6573 (MLC), 2013 WL 2182565, at *21 (D.N.J. May 20, 2013) (citing *Microbilt Corp. v. L2C, Inc.*, No. A–3141–09T3, 2011 WL 3667645, at *3 (N.J. App. Div. Aug. 23, 2011)) ("Under New Jersey law, a claim for fraud in the inducement seeking legal relief sounds in common-law fraud.").  As to both, Smartfish must show: "(1) a material representation of a presently existing or past fact, (2) made with knowledge of its falsity and (3) with the intention that the other party rely thereon, (4) resulting in reliance by that party (5) to his detriment." *Jewish Ctr. of Sussex Cty. v. Whale*, 86 N.J. 619, 624 (1981).

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard on claims alleging fraud or mistake.  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Rule 9(b) serves the goal of putting the party accused of a fraudulent act on notice as to the "precise misconduct" with which it is charged; accordingly, the complaint must allege facts that give rise to a strong inference of fraudulent intent.  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984); *accord Berman v. Morgan Keenan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012).  A party pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Institutional Investors Grp. v. Avaya, Inc.,* 564 F.3d 242, 253 (3d Cir. 2009)

(citation omitted).  "In other words, allegations of fraud must contain 'the who, what, when, where, and how: the first paragraph of any newspaper story.'"  *TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*, No. 12-3355 (RBK) (JS), 2013 WL 6048720, at *4 (D.N.J. Nov. 14, 2013) (quoting *Institutional Investors*, 564 F.3d at 253).

### 1.     Count Four:  Fraud in the Inducement

Count Four is not plead with the requisite specificity and therefore fails to state a claim. The FAC recounts several allegedly fraudulent statements made by Maxell, but these, for the most part, were merely promises by Maxell to honor the parties' Agreement.  *See* FAC ¶¶ 67–86. Promising to abide by a contract's terms, and then allegedly breaching the contract, does not of itself constitute fraud; it constitutes breach of contract.  *See State Capital Title*, 646 F. Supp. 2d at 676 (fraud claims may only proceed alongside contract claims if "the underlying allegations involve misrepresentations unrelated to the performance of the contract").

Of the statements the FAC alleges were made by Maxell, only three are fairly claimed to involve misrepresentations unrelated to the performance of the contract; each preceded formation of the Agreement.  These are that: (1) Maxell would invest more than $3 million into the venture with Smartfish and "stand by that financial commitment to the end"; (2) "Maxell possessed domestic and international distribution capabilities"; and (3) Maxell had "the unfettered power to ensure the placement of Smartfish products on the shelves of retailers with whom Maxell did business without requiring those retailers to approve."  FAC ¶¶ 22, 68(e)–(f).

In considering whether these claims are viable, the Court is mindful that "predictions of the future, which were believed when made, cannot serve as a basis for a fraud claim just because they subsequently turned out not to be true."  *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 436 (D.N.J. 1998) *aff'd*, 172 F.3d 859 (3d Cir. 1998); *see also Middlesex Cnty. Sewer. Auth.*

*v. Borough of Middlesex*, 74 N.J. Super. 591, 605 (Ch. Div. 1962); *Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1020, 1031 (D.N.J. 1995) ("A showing of simple non-performance of the promise will not satisfy plaintiff's burden to show that the promise was fraudulent when made.").  In short, fraud and fraudulent inducement claims must pleads facts that could support the plausible inference that the speaker did not believe his or her statements to be true at the time he or she made them.

Here, the FAC fails to plead any facts that could lead to such a plausible inference.  To be sure, Smartfish asserts, repeatedly, that the statements alleged were "false and untrue and known by Maxell to be so at the time the statement was made."  *See, e.g.*, FAC ¶ 71.  But Smartfish does not cite any concrete facts on which one could conclude that Maxwell—at the time it promised, for example, to invest more than $3 million into the venture—did not intend to keep such promises.  Such conclusory pleadings are inadequate.  *See Iqbal*, 556 U.S. at 678–79 (claims "supported by mere conclusory statements do not suffice . . . [w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations").  Such is true not only under Rule 9(b), but also under Rule 8.  *Id.* at 686–87; *see also Pullman v. Alpha Media Pub., Inc.*, No. 12 Civ. 1924 (PAC) (SN), 2013 WL 1290409 (S.D.N.Y. Jan. 11, 2013) *report and recommendation adopted*, No. 12 Civ. 1924 (PAC) (SN), 2013 WL 1286144, at *23 (S.D.N.Y. Mar. 28, 2013) (dismissing New Jersey fraud claim because, *inter alia*, statement that defendant "knew" statements were false "lack[ed] allegations to support it"); *Minutto v. Genesis Advisory Servs., Inc.*, No. 11-3391 (ES), 2012 WL 1085807, at *6 (D.N.J. Mar. 29, 2012) (dismissing fraud claim because complaint did not adequately plead defendant's knowledge of statement's falsity).

Because the FAC fails to plead facts that would permit the plausible inference that Maxell's agents or employees acted with the intent to defraud Smartfish, Count Four must be dismissed.

### 2.    Count Five:  Common-Law Fraud

For the same reasons, Count Five, alleging common-law fraud, fails to state a claim under Rule 9(b).

Count Five is, separately, deficient based on the economic loss doctrine.  Under that doctrine, as noted, a fraud claim may proceed alongside a contract claim only if "the underlying allegations involve misrepresentations unrelated to the performance of the contract."  *State Capital*, 646 F. Supp. 2d at 676.  Count Five fails to allege a fraud that is separate and distinct from the non-performance of the Agreement.  Smartfish's fraud claim instead arises out of the manner in which Maxell performed—or, more precisely, failed to perform—that Agreement. The FAC states that Maxell "defrauded Smartfish by falsely representing that it was ordering products for distribution [within] Maxell's areas of exclusivity," when in reality, Maxell was "diverting those products to unauthorized sales channels."  FAC ¶¶ 89–90.  This claim therefore effectively repackages Count Three's claim that Maxell sold products outside of its areas of exclusivity, and therefore harmed Smartfish.  This claim is fairly encompassed within Count One, for breach of contract.  Accordingly, Count Five is dismissed.

### D.    Count Eleven:  Breach of the Implied Covenant of Good Faith and Fair Dealing

Count Eleven asserts a claim for breach of the implied covenant of good faith and fair dealing.  "All contracts in New Jersey contain an implied covenant of good faith and fair dealing."  *TBI Unlimited, LLC*, 2013 WL 6048720, at *2 (citing *Fields v. Thompson Printing Co., Inc.*, 363 F.3d 259, 270 (3d Cir. 2004) and *Wade v. Kessler Inst.*, 172 N.J. 327, 340–41

(2002)).  To establish that Maxell breached this covenant, Smartfish "must prove that the breach

was conducted under a bad motive or intention."  *Id.* (citing *Wilson v. Amerada Hess Corp.*, 168

N.J. 236, 251 (2001)).  Such conduct is defined as that which violates "community standards of

decency, fairness or reasonableness."  *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping

Ctr. Assocs.*, 182 N.J. 210, 224 (2005).

Significant here, "[a] breach of the covenant of good faith and fair dealing must not arise

out of the same conduct underlying an alleged breach of contract action."  *TBI Unlimited*, 2013

WL 6048720, at *2 (citing *Wade*, 172 N.J. at 344–45).  "[W]hen a party breaches a duty set forth

explicitly in a contract, the remedy exists pursuant to those express terms, and not pursuant to

some implied obligation arising out of the contract."  *Id.* (citation omitted).  The covenant is to

be construed narrowly and used "only when gaps exist as to the parties' intentions."  *Id.* (citing

*Cargill Global Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 580 (D.N.J. 2010)).

Here, Count Eleven's claim that Maxell breached the implied covenant of good faith and

fair dealing is rooted in the allegations that underlie the breach of contract claim.  The FAC does

not allege facts that would support an inference of a "bad motive or intention" independent of the

fact of Maxell's alleged breaches; instead, it merely alleges that Maxell, in various ways, failed

"to perform its obligations under the Agreement," including that it breached "the Agreement's

restrictions of the distribution channels Maxell was authorized to utilize," and promoted its own

competing computer accessories by "using Smartfish's products as a higher priced straw man."

FAC ¶ 130.  Finally, in its brief opposing dismissal, Smartfish asserts, vaguely, that Maxell

engaged in "subterfuges and evasions in the performance of [the] contract," Pl. Br. 14, but this

general assertion, even if made in the FAC, would be too conclusory and insubstantial to sustain

Count Eleven.

Maxell's alleged failure to perform its obligations or to abide by the Agreement's restrictions, if true, would represent breaches of the Agreement, but that same failure, without more, cannot give rise to a separate cause of action.  *See Rivera v. Washington Mut. Bank*, 637 F. Supp. 2d 256, 269 (D.N.J. 2009) ("[M]ere failure to fulfill obligations encompassed by the parties' contract, including the implied duty of good faith and fair dealing, is not actionable in tort.").  Because the FAC does not assert concrete facts that could plausibly support an inference that these breaches were "conducted under a bad motive or intention," Count Eleven is dismissed.

### E.      Count Seven:  Patent Infringement

Count Seven is of a different nature.  It asserts a claim of patent infringement.  It is based on the claim that Maxell sold the products it purchased from Smartfish in unauthorized markets. FAC ¶ 96.

Maxell asserts that this count should be dismissed under the doctrine of patent exhaustion.  Maxell relies on, among other authority, the Supreme Court's decision in *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008), which states that the "longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item," *id.* at 625.  "The law is well settled that an authorized sale of a patented product places that product beyond the reach of the patent." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993); *see also Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1764 (2013) ("Under the doctrine of patent exhaustion, the authorized sale of a patented article gives the purchaser, or any subsequent owner, a right to use or resell that article.").  In this case, Smartfish owned the patent on the products it sold directly to Maxell, so those sales were, by definition, authorized.  Maxell asserts that these sales exhausted the

products' patents, and that Smartfish therefore does not have a cognizable patent infringement claim, regardless of whether Maxell resold the products in markets not authorized by the Agreement.  Although Smartfish may still assert a breach of contract claim, under this theory, its patent infringement claim would fail, as a matter of law, to state a claim upon which relief may be granted.

In response, Smartfish argues that patent exhaustion does not bar its claims here because its sales to Maxell were expressly conditioned upon Maxell's compliance with the terms of the distribution agreement.  Because Maxell allegedly violated those conditions, including by selling Smartfish's products outside of the authorized markets, Smartfish asserts, it may pursue claims for patent infringement.  To support its claim that a "conditional sale" does not give rise to patent exhaustion, Smartfish relies primarily on two Federal Circuit cases decided before the Supreme Court's decision in *Quanta*.  *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) ("an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter"); *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 709 (Fed. Cir. 1992) ("If the sale of the [patented device] was validly conditioned under the applicable law such as the law governing sales and licenses, and if the restriction on reuse was within the scope of the patent grant or otherwise justified, then violation of the restriction may be remedied by action for patent infringement.").

Smartfish's reliance on these cases is unavailing.  First, there is a substantial argument that *Quanta sub silentio* overruled *Mallinckrodt.*  One district court has held, in a thoughtful opinion, that *Quanta* did so.  *See Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575, 585 (E.D. Ky. 2009) ("The Supreme Court's broad statement of the law of patent exhaustion simply cannot be squared with the position that the *Quanta* holding is limited to its

specific facts."); *accord JVC Kenwood Corp. v. Arcsoft, Inc.*, 966 F. Supp. 2d 1003, 1010 n.1

(C.D. Cal. 2013) ("After *Quanta* . . . it is unclear to what extent the *Mallinckrodt* decision

applies.").  Arguing to the contrary, Smartfish relies on a single law review article.  *See* Pl. Br.

18–20 (citing William LaFuze, Justin Chen, and Lavonne Burke, *The Conditional Sale Doctrine

in A Post-*Quanta *World and Its Implications on Modern Licensing Agreements*, 11 J. Marshall

Rev. Intell. Prop. L. 295, 305 (2011)).  But that article is in the minority: "[A] majority of

commentators" have adopted the view that *Quanta* overturned the conditional sales doctrine.  *See*

Alfred C. Server and William J. Casey, *Contract-Based Post-Sale Restrictions on Patented

Products Following* Quanta, 64 Hastings L.J. 561, 596 (Apr. 2013).  As these commentators

note, the basis for claiming that *Quanta* overruled *Mallinkrodt* is easily put.  The portfolio of

computer technology patents at issue in *Quanta*, owned by LG Electronics, Inc. (LGE), were the

subject of an agreement under which Intel was authorized to manufacture and sell

microprocessors and chipsets that practiced the LGE patents.  These agreements placed specific

conditions on Intel's sales, including requiring that Intel's customers be given written notice that

Intel's license from LGE did not extend to any products the customers might make by combining

an Intel product with a non-Intel product.  Quanta purchased these goods from Intel but then

violated that term, leading LGE to sue Quanta for patent infringement.

The Supreme Court, however, held that LG Electronics' patent infringement claim had

been exhausted by the authorized sale of its device by its licensee, Intel, to third-party Quanta.

In so holding, the *Quanta* Court stated: "Because Intel was authorized to sell its products to

Quanta, the doctrine of patent exhaustion prevents LGE from further asserting its patent rights

with respect to the patents substantially embodied by these products."  553 U.S. at 637.  More

generally, the Court stated: "The authorized sale of an article that substantially embodies a patent

exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Id.* at 638.  As Server and Casey note, "from the Court's perspective, once it had been determined that Intel was authorized to sell the Licensed Intel Products to Quanta, patent remedies were exhausted by the sale and a post-sale restriction placed on Quanta could not preserve such remedies.  This interpretation supports a conclusion that the Supreme Court's decision in *Quanta* overruled *Mallinckrodt*."  64 Hastings L.J. at 583.

Even assuming the Federal Circuit's reasoning in *Mallinckrodt* remains good law, such that an exception to the patent exhaustion doctrine may remain for some form of "conditional sales," *Quanta* controls this case.  *Quanta* precludes the argument that any failure by a party to abide by any contractual condition in an agreement involving a patented device will revive an otherwise exhausted patent so as to permit the patentholder to sue for infringement, as opposed to, *e.g.*, breach of contract.  Here, Smartfish argues that Maxell's alleged contract breach should enable it to treat its sales to Maxell as "conditional" under *Mallinckrodt,* and thereby revived.  But exactly the same could be said of the breach in *Quanta*; indeed, the argument for reviving patent claims in *Quanta* was stronger, inasmuch as the breaching party (Quanta) was two steps removed from the patent holder (LGE), whereas here, Smartfish and the alleged breaching party, Maxwell, are in contractual privity.

Put differently, even assuming that the conditional sale doctrine of *Malllinkrodt* has some remaining vitality, *Quanta* precludes any claim that it applies to garden-variety breaches by a licensed distributor (or its downstream customer) such as those alleged here.  It is undisputed that Smartfish's sale of its patented products to Maxell was authorized, and that Section 7.1(a) of the Agreement conveyed "good and clear title to the Products, free and clear of all . . . claims against title or ownership (including, without limitation, claims of patent, copyright or trademark

infringement or violations or misappropriations of trade secrets or other intellectual property rights)."  Because the authorized sale of these products to Maxell exhausted Smartfish's patents, Smartfish may not, consistent with *Quanta*, invoke patent law to control or seek damages from Maxell's post-sale use or resale of these products.  Such claims here, instead, sound in contract. Accordingly, Count Seven is dismissed.

### F.     The FAC's Trademark-Related Claims

The FAC next asserts three trademark-related claims: Count Eight, alleging trademark infringement; Count Nine, alleging a violation of the Lanham Act; and Count 10, alleging a violation of N.Y. General Business Law § 360.  All three claims are dismissed.

**Count Eight** asserts a trademark infringement claim.  It alleges that Maxell "has utilized Smartfish's mark and marks confusingly similar thereto to sell its merchandise."  FAC ¶ 106. However, the products at issue were all sold to Maxell under the terms of the Agreement, meaning that "the only products sold or marketed by Maxell bearing Smartfish's trademarks originated with Smartfish itself."  Def. Br. 18.  Smartfish's own complaint is not to the contrary. *See* FAC ¶¶ 34–35.

"[A]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."  *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61–62 (2d Cir. 1992) (citing *NEC Electronics v. Cal Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir.), *cert. denied,* 484 U.S. 851 (1987)).  "Thus, a distributor who resells trademarked goods without change is not liable for trademark infringement."  *Id.* (citing 2 J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 25:11 (2d ed. 1984)); *see also Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, 816 F.2d 68, 76 (2d Cir.

1987) ("[T]rademark rights are exhausted once the trademarked goods have been duly placed into the market.").

Here, Maxell purchased Smartfish's products "free and clear of all . . . claims against title or ownership (including . . . copyright or trademark infringement . . . )."  Agreement § 7.1(a). Therefore, even if Maxell sold the Smartfish products it purchased in unauthorized markets, the FAC's trademark infringement claim would fail as a matter of law.  *See Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 326 (S.D.N.Y. 2007) (the first sale doctrine "ensures that an unauthorized distributor of a trademarked item is not liable for trademark infringement or dilution when the distributor resells a branded item in an *unchanged* state").  Accordingly, Count Eight is dismissed.

**Count Nine** asserts a violation of the Lanham Act.  The FAC claims that Maxell, by "misappropriating and using Smartfish's mark," has "misrepresented and falsely described to the general public the source of origin of the merchandise so as to create the likelihood of confusing" the ultimate purchase as to the source of the merchandise.  FAC ¶ 118.  A trademark owner attempting to use the Lanham Act to prevent an infringement "must establish that the products sold by the alleged infringer are not 'genuine.'" *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citing *Weil Ceramics and Glass, Inc. v. Dash*, 878 F.2d 659, 671–73 (3d Cir. 1989) and *El Greco Leather Prod. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395–99 (2d Cir. 1986)).  A product is not genuine if there are "'material differences' between the products sold by the trademark owner and those sold by the alleged infringer."  *Id.* at 302–03 (citations omitted).

Here, the products in question were all manufactured by Smartfish and sold directly to Maxell; they are therefore genuine.  They were also sold "free and clear . . . of all claims against

26

ownership."  Agreement § 7.1(a).  Count Nine therefore fails for the same reason as Count Eight, and is dismissed.

**Count Ten** asserts a claim under N.Y. General Business Law § 360.  Smartfish alleges that "Maxell's activities are likely to dilute the distinctive quality of Smartfish's mark and/or trade name and injure [its] business reputation."  FAC ¶ 125.  The relevant provision of § 360 states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360-l.[6]

Smartfish seeks an injunction to prevent Maxell from continuing to sell the products Maxell has already purchased.  To succeed on such a claim, a plaintiff "must prove (1) that the trademark is truly distinctive or has acquired secondary meaning, and (2) a likelihood of dilution either as a result of 'blurring' or 'tarnishment.'"  *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 496 (S.D.N.Y. 2004) (citation omitted).  "Blurring occurs when the defendant uses a mark that is the same or similar to the plaintiff's mark to identify its goods, causing a potential loss of distinctiveness of the plaintiff's mark to the plaintiff's product."  *Hearts on Fire Co., LLC. v. L.C. Int'l Corp.*, No. 04 Civ. 2536 (LTS) (MHD), 2004 WL 1724932, at *3 n.2 (S.D.N.Y. July 30, 2004) (citing *New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 558 (2d Cir. 2002)).  "Tarnishment occurs when the defendant uses the mark

---

[6] In its brief, Smartfish claims to also raise claims under N.Y. Gen. Bus. Law § 360-k (infringement).  *See* Pl. Br. 22.  The FAC, however, alleges only that Maxell's activities "dilute[d] the distinctive quality" of the trademark, and "injure[d] the business reputation of Smartfish."  FAC ¶ 125.  Fairly read, these assertions only plead claims under N.Y. Gen. Bus. Law § 360-l.  In any event, were Smartfish to plead an infringement claim under § 360-k, that claim would be dismissed for the same reasons as the claims discussed *supra*.

in a way that dilutes the quality or prestige associated with the plaintiff's mark because of

confusion between the two marks." *Id.* at *3 n.3 (citation omitted).

As noted, Smartfish concedes that Maxell is selling genuine Smartfish products. And as

with the other trademark claims, blurring and tarnishment cannot exist under N.Y. Gen. Bus.

Law § 360-l when the products at issue are genuine. *See, e.g.*, *Krasnyi Oktyabr, Inc. v. Trilini

Imports*, 578 F. Supp. 2d 455, 471 (E.D.N.Y. 2008). Accordingly, Count Ten is dismissed.

### G.      Count 13:  Equitable Accounting

Count Thirteen seeks an accounting of Maxell's "sales, collections, receipts,

disbursements, charges, payments, and profits in specific detail with respect to the products

which were the subject of the Agreement." FAC ¶ 139. Under New Jersey law:

> An accounting in equity cannot be demanded as a matter of right or of course.
> The exercise of the equitable jurisdiction to compel an account rests upon three
> grounds—first, *the existence of a fiduciary of trust relation*; second, the
> complicated nature or character of the account; and third, the need of discovery.

*Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 323 (D.N.J. 2012) (citing *Borough of

Kenilworth v. Graceland Mem'l Park Ass'n*, 124 N.J. Eq. 35, 37 (Ch. 1938)) (emphasis added).

In short, unless there was a fiduciary relationship between Smartfish and Maxell, Count Thirteen

must be dismissed. *Id.*

The FAC's assertion that "Maxell was a fiduciary of Smartfish" is based solely on the

fact that "Maxell repeatedly represented to Smartfish and the public that it was entering into a

'partnership' with Smartfish and that it was Smartfish's partner." FAC ¶ 138. But, even taking

this claim as true, it does not allege facts sufficient to give rise to a fiduciary relationship. Under

New Jersey law, "characterizing the relationship between the parties as a 'special partnership' is

insufficient to create a legal partnership, giving rise to fiduciary obligations." *Alexander*, 991 F.

Supp. at 438 (citing *Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.*, 696 F. Supp.

57, 74 (D. Del. 1988) *aff'd*, 988 F.2d 386 (3d Cir. 1993)).  A fiduciary relationship exists only "where one party has the power and opportunity to take advantage of the other, because of that other's susceptibility or vulnerability."  *Id.* (citations omitted).

Here, based on the allegations in the FAC, Smartfish and Maxell are business entities that undertook an arms-length relationship pursuant to a distribution agreement; the FAC does not allege facts indicating that either party had special power over the other.  Such an ordinary commercial transaction does not give rise to a fiduciary relationship.  *See id.* ("[F]iduciary duties are not imposed in ordinary commercial business transactions."); *International Minerals and Min. v. Citicorp, North America,* 736 F. Supp. 587, 597 (D.N.J. 1990) ("Where a party does not owe another a duty of care absent the existence of a contract, a separate duty of care cannot arise simply by virtue of the existence of the contract.").

Because the FAC has not plausibly alleged a fiduciary relationship between Smartfish and Maxell, Count Thirteen is dismissed.

## CONCLUSION

For the foregoing reasons, Maxell's partial motion to dismiss is granted.  Counts Two through Thirteen are dismissed.  With respect to Count One, Maxell's motion to dismiss certain damages claims is granted.  Specifically, the Court dismisses the FAC's claim for $3.6 million in additional damages for breaches of Maxell's alleged minimum-purchase obligation during the two 18-month periods that followed the initial 18-month period commencing December 22, 2009.  The Clerk of Court is directed to terminate the motions pending at docket numbers 9, 13, 24, and 28.

Because the Court has dismissed the FAC's federal statutory claims, an issue arises as to whether the Court retains subject matter jurisdiction over this lawsuit.[7]  The parties are directed to meet and confer by April 28, 2014, and to submit to the Court, by May 2, 2014, a joint letter setting out, in detail, their respective views as to whether there is diversity jurisdiction over this matter; and if not, whether the Court should nevertheless exercise supplemental jurisdiction over the sole remaining claim, for breach of contract.  In the event that either party concludes either that there is diversity jurisdiction or that the exercise of supplemental jurisdiction is merited, the joint letter should also address the timetable by which the parties wish to proceed in this litigation; Maxwell must also file its Answer within one week of this submission.  Upon any such submission, the Court will promptly resolve whether it intends to retain jurisdiction over this matter.[8]

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: April 23, 2014
       New York, New York

---

[7] *See* Tr. at 4 ("Q:  In other words, in the event that the federal statutory claims, intellectual property claims are dismissed, then we need to drill down to see if there is, in fact, diversity following the LLC down to the real people.  A:  Yes, we would certainly agree with that.").

[8] The parties recently submitted letters regarding a dispute over the protective order that will cover a subset of the documents exchanged in discovery. *See* Dkt. 46–47.  The Court reserves on this issue, pending resolution of the Court's jurisdiction and of next steps in this litigation.